UNITED STATES DISTRICT COURGT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>ATLANTIC PROPERTY MANAGEMENT CORP. AND DIVERSIFIED FUNDING, INC.,<br><br>    Defendants. | Civil Action No.:<br>1:24-cv-10370 |

**MEMORANDUMN IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I. Introduction

Defendants Atlantic Property Management Corp. ("Atlantic") and Diversified Funding, Inc. ("DFI") offered Tiffany Gunther the position of Executive Administrative Assistant in its Boston office in September 2021. After she disclosed voluntarily that she had received a cancer diagnosis, the Defendants requested information about any limitations to her ability to perform the essential functions of the position. The Defendants requested clarification from her doctor when the initial information Gunther provided lacked any detail. After receiving additional information, Defendants determined that her amount of time off requested combined with the indefinite duration that she would need time off was not reasonable and she could not perform the duties of the position. Gunther then brought an administrative charge of discrimination and retaliation against Defendants, which the EEOC credited and then filed an enforcement action on behalf of Gunther in this forum. Contrary to the EEOC's position, however, the American with Disabilities Act does not provide employees with a right to every requested accommodation, but

only *reasonable* accommodations. Because the EEOC does not have evidence showing that Gunther's requested accommodation was reasonable, and where such changes would have imposed an undue hardship on Defendants, and because Defendants' response to the requested accommodation does not, as a matter of law, amount to retaliation, the EEOC's claims must be dismissed and the Court must grant judgment in favor of Defendants on all Counts.

## II. Relevant Background

Defendant Diversified Funding, Inc. ("DFI") manages commercial, residential, and hotel properties in Rhode Island, Massachusetts, and New Hampshire. SOF, ¶1. DFI was first opened in 1975 by its president Richard Bendetson. *Id.,* ¶2. Defendant Atlantic Properties Management Corporation ("Atlantic") employs the people who provide services – leasing, reception, maintenance, etc. – for the properties managed by DFI and its central office in Boston.[1] *Id.,* ¶3.

The Boston office is where Bendetson works along with Vice President Samantha McCourt and Controller Cheryl Foote. SOF*,* ¶4. The Boston office is also where accountants work, Senior Manager Todd Wilson, and the Executive Administrative Assistant. *Id.*, ¶5. There are approximately 100 employees in the total company including the Boston office. *Id.*, ¶6.

In August 2021, Defendants first interviewed Tiffany Gunther for the EAA position. SOF, ¶7. Regional Leasing Manager Rebecca Russo, who works out of the Revere office, interviewed Gunther herself initially and then recommend her for further interviews in the Boston office. *Id.*, ¶¶8-9. Gunther then interviewed with Foote, Bendetson, and McCourt individually in the Boston office. *Id.,* ¶11. She was told by Foote that once "you get the basics down," she would "later start training and working under Samantha [McCourt] more." *Id,* ¶12.

---

[1] Atlantic employs these people through agreements between DFI and Atlantic. The Defendants stipulated, without admission, that they can be considered joint employers of the EEOC for purposes of this matter.

At some point before a job offer was made, Gunther disclosed to Russo that she was experiencing some medical issues for which she was seeing a doctor. SOF, ¶13. She exchanged text messages with Russo about her doctors' appointments during the interview process. *Id.*, ¶¶14-16. Defendants sent Gunther a written job offer on September 22, 2021, with a job description, which she accepted the following day. SOF, ¶¶17, 19. Gunther denies that she knew that she had cancer when she received the job offer. *Id.*, ¶18. She had received a biopsy on September 16, 2021 revealing a grade 3 carcinoma (meaning, in plain terms, stage 3 cancer), which she learned about a few days later. *Id.*, ¶19.

On September 23, Foote sent an email to Russo stating that Gunther accepted the offer and that Gunther had a meeting today with the doctor "to discuss the chemo treatment and surgery required for the cancer." SOF, ¶24.  Gunther recalled at her deposition that she disclosed her cancer to Defendants when she was scheduling her first day with Defendants. *Id.*, ¶21. Gunther testified that she disclosed her cancer diagnosis to Defendants voluntarily because she felt being transparent "was the right thing to do." *Id.*, ¶22. Gunther asserted that she did not know that she was diagnosed with cancer when she received the offer of employment and that she had not made Defendant aware of any medical issues prior to the offer. *Id.*, ¶23.

On September 30, 2021, Foote sent Gunther an email asking her for information about any limitations on her ability to perform the essential functions of her job due to her "medical condition or treatment" and if so, whether any reasonable accommodation was requested. SOF, ¶25. Foote sent the letter because Defendants didn't know what the diagnosis and resulting treatment meant to Gunther's abilities to do job. *Id.*, ¶26. The email includes the same job description for the EAA that was sent to Gunther with her job offer. *Id.*, ¶27 The job description listed four bolded categories of responsibilities: Marketing and Advertising, Human Resources,

3

Travel Arrangements and events, and General. More specific duties appeared under each bolded category. *Id.*, ¶28. Under General, the duties included responding to requests from President [Bendetson] and [Vice President] (McCourt) for coffee and other errands; preparing Massachusetts eviction paperwork as needed; making bank deposits; typing, filing, phone calls, emails as requested by President, Vice President, Director of Lending, Controller and in-house Attorney. *Id.*, ¶¶28-29.

Gunther had never worked for a real estate management company before and had no training in the eviction process. SOF, ¶30. Being trained on the eviction process takes months and is critical to the EAA position because the company needs to send out eviction notices on the tenth day of each month under Massachusetts law. *Id.*, ¶34. Since Russo has worked for the company since 1993, she has experience in the eviction process in Massachusetts and trains the EAA. *Id.*, ¶¶31-32. She describes the process as "time-consuming" and "can sometimes be seven days a week all eyes and communicating with our team to make sure we're not serving documents improperly." *Id.*, ¶¶33. On the tenths date, the computer system issues notices for tenants who are delinquent, and then the EAA has to ensure that the notices are sent out to the new tenants and any tenants who are still delinquent from past months. *Id.*, ¶¶34. The EAA then tracks the eviction process through to completion. *Id.*

When the company had a temp in the EAA position, the employee did not perform the eviction process because of the training required. SOF, ¶¶37-38. They hired a permanent replacement for the temporary worker in January 2022 and trained her on the eviction process. *Id.*, ¶41. This individual, Elizabath Roesel, remained until November 2022, and a new EAA, Rebecca Foote, came aboard who remained until August 2024. Both of these employees performed the eviction process duties in the EAA position. *Id.*

Gunther responded to Foote's request for a doctor's note on October 5 via email, sending a link to a note which she sent via screenshot the next day. SOF, ¶5. The note, dated September 30, 2021, was from Loren Winters, CNP for Beverly Moy, M.D. and states in full: "Tiffany Gunther is a patient under the care of Dr. Beverly Moy for the treatment of cancer. *Id.* She is able to work during her treatment and perform duties as an Administrative Assistant. She will need time off for treatment and intermittently for recovery as needed." *Id.*  The company (Foote and Bendetson) felt this letter was vague and did not provide any detail on how frequent treatment would be needed, how much time off Gunther would need, particularly how intermittent time off would be needed for recovery. *Id.*, ¶43. On October 13, the company, via Foote, emailed Gunther to request "additional information from your doctor." *Id.*, ¶44. The attached letter asked Gunther to provide the following information to her medical provider so the company could determine whether it can provide a reasonable accommodation: "Please provide as much as detail as possible about how frequently the employee will need time off for treatment, the length of any appointment for treatment, and the length of any periods of recovery." *Id.*

Thirteen days later, on October 26, Gunther sent a response back to Defendants with a second note from CNP Loren Winters.[2] SOF, ¶45. This second note represents again that Gunther can work during her treatment and perform the duties of an Administrative Assistant, and that Gunther

> will need time off for treatments, given weekly, approximately 4-5 hrs for visit/treatment. This will be followed by surgery and recovery (length TBD), and followed by visit/treatments, and also approx. 4-5 hr visits, every 3 weeks for a year. She may require 1-3 unplanned days off for symptoms related to treatment intermittently, once a month.

*Id.*

---

[2] The note is dated October 19, but Gunther delivered it via email on October 26 because, according to the email, it was mailed to Gunther.

After receiving the second note, Foote and Bendetson discussed Gunther's necessary accommodations. SOF, ¶47. From their judgment, she was going to be out of work too often so that she could not be properly trained on the eviction process and not available to perform this and other duties that needed to be completed on a daily, regular basis. *Id.*, ¶48. Further, during her absences, her work would have been needed to be redistributed to Foote, McCourt, Russo (evictions), and even Bendetson on top of their regular duties. *Id.*, ¶¶46-48. Based on this, Foote and Bendetson decided to rescind the offer of employment. *Id.*, ¶47. The company informed Gunther of this decision on October 28. *Id.*, ¶48.

About ten days before Defendants rescinded their offer, on or around October 17, Gunther's sister Melissa Varner posted a fundraising request for her sister's cancer treatment on the GoFundMe website.[3] SOF, ¶54. She created the content of the GoFundMe page herself. *Id.*, ¶55. Everything on the page about Gunther's cancer was learned from Gunther herself. *Id.*, The page includes the following statement about Gunther:

> She has been trying relentlessly to find employment since [July 2020] and just recently got offered a part-time position working from home. However this income alone can barely over the cost of her rent. With Tiff starting the more aggressive Chemo in November she won't be able to work, physically, she had hoped to start her second job, but unfortunately her Oncology team can not consider her physically capable of completing the duties required in her job description.

*Id.*, ¶56.

---

[3] The October 17 date is based on the content of the GoFundMe page where Varner writes that Gunther learned about her cancer diagnosis "five weeks ago" on September 10. Varner agreed that five weeks after September 10 is on or around October 17.  The text "Created October 21, 2021" is also printed on the bottom of the GoFundMe page. SOF, ¶54.

Gunther was aware of and reviewed the content of the fundraising page before it was posted and even shared part of the post via text message before losing her job with Defendants. *Id.*, ¶57.

During discovery, Defendants requested documents reflecting mitigation efforts from Gunther. SOF, ¶58. The EEOC objected to portions of this request, but also responded that it would produce "the non-privileged portions of the administrative investigation file and ***documents from the Charging Party responsive to this request***." (emphasis added). *Id.,* ¶59. At her deposition on April 17, 2025, Gunther testified that she had searched for documents concerning her job search in response to discovery request and sent them to the EEOC. *Id.,* ¶60. She clarified that she sent over "anything that was helpful." *Id.* Following Gunther's deposition, EEOC produced a supplemental production on May 22, 2025. SOF, ¶61. The production includes an email from Gunther concerning an interview for a position as an administrative assistant at Harvard dated November 5, 2021. *Id.* Gunther declines the offer, stating: "I am unfortunately not available for the position as I have had an unexpected health issue come up. It will be a few months before I will be well enough to start a new job." *Id.,* ¶62. EEOC did not produce any records of Gunther communicating directly with any employment efforts for employment between November 5, 2021 and February 19 2022. *Id.,* ¶63.

Gunther started her cancer treatment the first week of October 2021. SOF, ¶64. She had chemotherapy appointments on Fridays. *Id.,* ¶65. By October 6, her providers recommended surgery, then radiation. *Id.,* ¶66. Her records around October 22 indicate that she had lost eight pounds, suffered for headaches one to three days after chemotherapy, and was tired in the afternoons. *Id.,* ¶67. It was "very typical" that she slept most of the day after chemotherapy. *Id.,* ¶68. She switched to a more aggressive chemotherapy treatment on or around October 30, 2021. *Id.,* ¶69. She received growth hormones injections as part of her treatment that caused "severe

pain" in her femur for which she received oxycodone and sometimes took medical marijuana. *Id.* She had surgery on February 1 to remove her tumor. *Id.*, ¶70. Her medical note on February 10 states that she was "hoping to return to work." She started radiation treatment in March which continued to May 2022. *Id.,* ¶71. In the spring of 2022, Gunther finally received a full-time job and switched her chemotherapy appointments to Saturday, explaining at her deposition: "I understand when you start a new job, you're going through training. You're learning things and that you need to -- it's critical that you're there, you know, all the time." *Id.,* ¶72.

On June 30, 2022, Gunther filed a sworn complaint under oath with EEOC alleging that she was discriminated against and retaliated against because of her disability by DFI and Atlantic and denied a reasonable accommodation. SOF. ¶73. On November 1, 2023, the EEOC issued a Letter of Determination on Gunther's Charge of Discrimination. *Id.* ¶74.

### III. Standard of Review

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a). "An issue is 'genuine' if a rational factfinder could resolve it in favor of either party, and a fact is 'material' if it has the capacity to change the outcome of the suit." *Rodríguez v. Encompass Health Rehab. Hosp. of San Juan, Inc.*, 126 F.4th 773, 779 (1st Cir. 2025); *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 24 (1st Cir. 2009). Although facts and reasonable inferences are considered in the light most favorable to the non-moving party, that party nonetheless bears the burden to demonstrate that, "with respect to each issue on which he would bear the burden of proof at trial. . . a trier of fact could reasonably resolve that issue in h[is] favor." *Borges v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is significantly

probative." *Id.* (quotation and brackets omitted). "If the nonmovant fails to make this showing, then summary judgment is appropriate." *Id.*

IV. <u>Argument</u>

**1.      EEOC Has Not Provided Sufficient Evidence To Support Any of Its Claims.**

The Complaint filed by the EEOC alleges three "unlawful employment practices" under its Statement of Claims, although it does not separately delineate the claims under distinct Counts. The allegations appear to state the following violations of the ADA: disability discrimination in violation of 42 U.S.C. § 12112(a), failure to accommodate in violation of 42 U.S.C. § 12112(b)(5), and retaliation in violation of 42 § 12203(a). Complaint, ¶16. Defendants will address each alleged violation and why summary judgment is appropriate on each claim.

A.      <u>EEOC Cannot Succeed on Its Discrimination Claims</u>.

A claim of discrimination based on disability under § 12112(a) requires a plaintiff to show that the following three elements: 1) that she was disabled within the meaning of the ADA, i.e., that she has a physical or mental impairment that substantially limits one or more  major life activities; 2) that with or without reasonable accommodation she was a qualified individual able to perform the essential functions of the job; and 3) that the employer discharged her because of her disability. *See Velez-Ramirez v. Puerto Rico,* 827 F.3d 154, 157 (1st Cir. 2016).[4]

---

[4] Claims under the ADA where the employer acknowledges that it took the adverse action because of an inability to accommodate the complainant's disability or the complainant's lack of qualifications to perform the essential functions do not proceed under the familiar McDonnell-Douglas burden shifting framework because proof of liability is by direct evidence. *See Phelps v. Optima Health*, Inc., 251 F.3d 21, 24 (1st Cir. 2001) (describing summary judgment standard for disability discrimination where employer agrees that employee was discharged because of disability); *Gannon v. Boston*, 476 Mass. 786, 793 (2017) (describing the two categories of handicap discrimination cases – first where employer denies that the personnel decision was based on handicap, and second where employer acknowledges the decision was based on handicap but asserts the decision was lawful).

A failure to accommodate a covered individual's disability can be a form discrimination. 42 U.S.C. § 12112(b)(5) (defining "discriminate against a qualified individual on the basis of disability" to include failure to accommodate unless the employer can demonstrate that the accommodation would impose an undue hardship). To establish a claim for failure to reasonably accommodate, a plaintiff must produce sufficient evidence for a reasonable jury to find: 1) she was disabled within the meaning of the ADA; 2) she was a qualified individual, and 3) the employer, despite knowing of the plaintiff's disability, did not reasonably accommodate it. *See Together Emples. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 428-29 (D. Mass. 2021), *citing Flaherty v. Entergy Nuclear Operations, Inc.,* 946 F.3d 41, 55 (1st Cir. 2019).

The common element between these two claims is that the employee was qualified – i.e. capable -- to perform the given position, with or without an accommodation. Here, the evidence does not allow a finding that Gunther could have performed the EAA position with the accommodations requested.

i.    <u>The Evidence Does Not Allow A Jury To Find That Gunther Was A Qualified Handicapped Individual.</u>

The record does not contain sufficient evidence that Gunther was able to perform the duties of the EAA position at the time that the company rescinded the offer to her on October 28, 2021. Her statements, her medical records, and the duties of the position make this clear.

Gunther acknowledged in October and early November 2021 that that she could not perform the duties of an administrative assistant due to her health on two different occasions, once explicitly and once through statements that she endorsed. She declined an interview with a prospective employer on November 5 for a position as an administrative assistant because she was unable to work "for a few months" due to unexpected health issues. SOF, ¶62. A few weeks earlier in mid-October, she approved an online fundraising message posted by her sister to

support her cancer treatment that described her as unable to accept at a new job offer due to her cancer treatment. *Id.,* ¶57. At the time, Defendants had provided her with the EAA job description, which she gave to her doctor, and then Gunther provided two medical notes. The second note indicated that Gunther would need to miss three-quarters to one day per week[5] and an unknown amount of time for treatment and recovery going forward, *after* the Defendants had asked for more information about the treatment so they could understand better what accommodations Gunther needed.

In consideration of the entire record, Gunther's statement establishes that she could not perform the duties of the EAA position. This is not speculation; rather, she knew the duties and responsibilities of the position, she knew her medical condition, expected treatment, and anticipated recovery at the time, and she then made statements that disclaimed her ability to work at a substantially similar job and approved statements that disclaimed her ability to work at the EAA position. Fed.R.Evid. 801(d)(2)(A), 801(d)(2)(B), 803(3), 807.

The statements by Gunther in her November 5, 2021 email disclaiming her ability to work for several months at the administrative assistant job at Harvard are admissible as non-hearsay as statements of a party-opponent. *See United States EEOC v. Placer ARC,* No. 2:13-cv-0577-KJM-EFB, 2016 U.S. Dist. LEXIS 1947, at *6-7 (E.D. Cal. Jan. 6, 2016) (approving trial court's order denying EEOC's motion to deny admission of charging party's out of court statement); *EEOC v. Triangle Catering, LLC*, No. 5:15-CV-00016-FL, 2017 U.S. Dist. LEXIS 28476, at *8-9 (E.D.N.C. Mar. 1, 2017) (same ). *But see US EEOC v. Rent-A-Center E. Inc.*, 303 F. Supp. 3d 739, 743 (C.D. Ill. 2018) (requiring that statement be made by EEOC itself).

Although there does not appear to be any decisional law by the District Court or any

---

[5] The notes state 4-5 hours of treatment weekly.

court in the First Circuit addressing the issue, this Court should follow *Placer ARC* and *Triangle Catering* and rule that Gunther's November 5 email meets the definition of a party-opponent statement under Fed.R.Evid. 801(d)(2) notwithstanding the EEOC, and not Gunther, being the official party. The EEOC chose to bring her case to this forum and vindicate her rights in Court rather than remain at the administrative agency. It had no obligation to do so. 29 C.F.R. § 1601.27 ("The Commission *may* bring a civil action against any respondent named in a charge not a government, governmental agency or political subdivision, after thirty (30) days from the date of the filing of a charge with the Commission . . . .") (emphasis added). Gunther filed a sworn complaint attesting to her being a qualified handicapped individual. SOF, ¶72. The EEOC investigated her allegation and issued a Letter of Determination. *Id.*, ¶73.[6] The EEOC made the decision to bring a civil action on behalf of Gunther after investigation her claims and making this determination. She is not a third-party witness to its independent enforcement action.

Even if the November 5 email is not admissible under Rule 801(d)(2), it is admissible under Rule 803(3) as a contemporaneous statement about her present physical condition. *See Gucker v. United States Steel Corp.,* 2016 U.S. Dist. LEXIS 11519, at *8-9 (W.D. Pa. Jan. 31, 2016) (allowing in camera consideration of co-workers' testimony about plaintiff's statements concerning his ability to work under Rule 803(3)).[7] The physical condition made her unable to

---

[6] Defendants anticipate that the EEOC will ask the Court to consider the Letter of Determination as substantive evidence under Rule 803(8). The Court should refuse to do so as the danger of unfair prejudice far outweighs any probative value where the investigation either ignored or did not consider Gunther's contemporaneous statements disclaiming her capacity to work. Fed.R.Evid. 403; *Odunukwe v. Bank of Am.,* 335 F. App'x 58, 63 (1st Cir. 2009) (finding no abuse of discretion in court's refusal to consider MCAD investigation fact sheet and citing two cases with same rulings).

[7] The fact that Gunther could not work at the Harvard position and Defendant's job is buttressed by the fact that EEOC did not produce any records of Gunther's search for employment dated after the November 5, 2021 email where Gunther turned down the interview.

work for a few months by her own admission.

Gunther's adopted statement in the fundraising page is also admissible under Rule 801(d)(2)(B). Under Fed.R.Evid. 801(d)(B), a party is deemed to have adopted a third-party statement if it "manifested that it adopted or believed [it] to be true." This exception does not require an employment relationship or for the speaker to have been given legal authority to speak for and bind the party, but only rather manifested its adoption or belief in its truth. *See Ratcliffe v. BRP U.S., Inc.*, No. 1:20-cv-00234-JAW, 2024 U.S. Dist. LEXIS 201815, at *16-17 (D. Me. Nov. 6, 2024) (finding publication on company's website of "Tech Talk" and its statements in support of credibility of speaker allowed for admission of video under Rule 801(d)(2)).[8] So-called "adopted admissions" are found where i) a statement is made in a party's presence, ii) the nature of the statement is such that it normally would induce the party to respond, and iii) the party nonetheless fails to take exception. *See United States v. Miller*, 478 F.3d 48, 51 (1st Cir. 2007), *citing* Rule 801(d)(2)(B). Here, Gunther reviewed the content of the fundraising post prior to its publication, allowed it to be posted without revision, sent part of the fundraising statement via a text message later, and accepted the fundraising money *despite* later filing a legal claim in which she asserts ability to work. This fits the definition of an adopted admission squarely.

Finally, the statements can be admitted at trial under the residual exception to the hearsay rule. Fed.R.Evid. 807. Under Rule 807, a hearsay statement can be admitted under the following conditions:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

---

[8] Because *Ratcliffe* found that the videos in question were admissible under Rule 801(d)(2)(B), the court declined to reach the secondary issue of whether they could also be admissible as statements of a party-opponent under Rule 801(d)(2)(D). *Id.* at *16.

(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

*Id.*

All the factors in favor of admissibility under Rule 801(d)(2), discussed *supra* -- to the extent they do not demonstrate admissibility under that rule itself – weigh in favor of the residual exception. The record shows two separate statements – one by Gunther herself and one by her through adoption – where she disclaimed her ability to work at the EAA position and a substantially similar position. Gunther had no ulterior motive to make these statements; on the contrary, making these statements undermines her claim that she can work despite her cancer treatment. *See Walker v. Johnson,* 501 F. Supp. 2d 156, 162 n.2 (D.D.C. 2007) (finding statement by employer's representative to EEO counselor corroborated by others and not contradicted by herself later admissible under Rule 807); *Mun Phan v. Trinity Reg'l Hosp.*, 3 F. Supp. 2d 1014, 1023 (N.D. Iowa 1998) (allowing statement attributed to witness to be admitted based on corroboration from other witnesses).

Even if the Court does not admit Gunther's statements, the evidence will still not allow finding that she was a qualified handicapped individual. The EEOC carries the burden of proof on this issue. *See Calef v. Gillette Co.*, 322 F.3d 75, 86 (1st Cir. 2003) ("Plaintiff bears the burden of showing he is qualified.") Her second doctor's note informed the company that she could not regularly attend work as she needed to miss one day each week for the foreseeable future with more unscheduled absences coming. An individual incapable of regular attendance is not qualified to perform the essential functions of the EAA position.[9] *See Benson v. Wal-Mart Stores*

---

[9] Even Gunther acknowledged at her deposition, in testimony about subsequent employment, when "you're going through training . . . you need to -- it's critical that you're there, you know, all the time." SOF, ¶__.

*E., L.P.*, 2020 U.S. Dist. LEXIS 59203, at *17 (D. Me. Apr. 3, 2020) ("[T]he need for attendance is self-evident in this case.").

In the First Circuit "[courts] generally give substantial weight to the employer's view of job requirements," although the view is not dispositive. *Richardson v. Friendly Ice Cream Corp.*, 594 F.3d 69, 76 (1st Cir. 2010). The EAA duties at the time involved handling the eviction process for the Massachusetts properties, which required significant training. Based on Bendetson's and Foote's determination and Russo's testimony, Gunther needed to be available on a steady basis to be trained in this process, which could take up to several months. "[A] regular and reliable schedule may be an essential element of most jobs." *Ward v. Mass. Health Research Inst., Inc.,* 209 F.3d 29, 35 (1st Cir. 2000). EEOC has no evidence to refute this.

Defendants anticipate that EEOC will contend that the eviction process was not part of the responsibilities of the EAA position at later times and thus cannot be considered one of Gunther's essential duties. But this argument has been considered and flatly rejected by the First Circuit. "The fact that an employee might only be assigned to certain aspects of a multi-task job does not necessarily mean that those tasks to which she was not assigned are not essential." *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 26 (1st Cir. 2001). Moreover, the operative position was the one that existed in October 2021 for Gunther, not the one that was restructured by the company later for temporary employees. "Whether an individual is a qualified individual with a disability is determined at the time of the employment decision." *Ballinger v. Town of Kingston*, 2019 U.S. Dist. LEXIS 213122, at *20 (D. Mass. Dec. 10, 2019).

It is also not a reasonable accommodation, as EEOC appears to believe, to expect that other employees perform Gunther's essential duties during her absences. "[T]he law does not require an employer to accommodate a disability . . . by reallocating essential functions to make

15

other workers' jobs more onerous." *Der Sarkisian v. Austin Preparatory Sch.,* 85 F.4th 670, 677 (1st Cir. 2023) (rejecting plaintiff's argument that other teachers take on more teaching responsibilities as part of her requested accommodation as "unreasonable on its face"); *Harris v. Nat'l Grid USA Serv. Co., Inc*, 2025 U.S. Dist. LEXIS 56112, at *22 (D. Mass. Mar. 26, 2025) (Kelley, J.) ("[D]elegation of [plaintiff] essential responsibilities to colleagues fail to qualify as reasonable accommodations."). Other workers in the Boston office -- Foote, Bendetson, McCourt and accountants -- would have needed to perform the regular assistant duties of Gunther during her absences on top of their regular duties. Russo would have needed to perform the eviction process. The law does not require this.

ii.     EEOC Cannot Show That Defendants Unlawfully Failed To
        Accommodate Gunther's Disability.

The record does not allow a jury to find that Defendants unlawfully failed to accommodate Gunther's medical condition and treatment. After she informed Foote about her condition, the company engaged in the interactive process by requesting information about the course and extent of her treatment and seeking clarification from her medical provider. Based on the information received, the duties of the position, and the needs of the company, they could not provide her accommodations and still have her necessary duties fulfilled. Put otherwise, the requested accommodation was not reasonable. *See Bostick v. Smith & Wesson Corp.*, 2017 U.S. Dist. LEXIS 75105, at *30 (D. Mass. Apr. 25, 2017) ("The operative question in analyzing if an employee's requested leave or leave extension is a reasonable accommodation is whether it is one which presently, or *in the immediate future*, enables the employee to perform the essential functions of the job."); *Simon v. Harvard Vanguard Med. Assocs*, 2015 U.S. Dist. LEXIS 154911, at *20 (D. Mass. Nov. 16, 2015) ("To fulfill their obligation of a reasonable

16

accommodation to a handicap, employers need not make substantial changes in the standards of a job.").[10]

The evidence is undisputed that regular in-person attendance is essential for the EAA position. This is particularly true at the beginning of the EAA position for training purposes, as Foote and Bendetson testified and even Gunther acknowledged at her deposition. Accommodating Gunther's disability would have required reallocating her eviction duties to Russo and her general administrative assistant duties once per week to others in the Boston office for an indefinite period, which is not reasonable. *See Henry v. United Bank*, 686 F.3d 50, 61 (1st Cir. 2012) (describing open-ended request for leave as "wait and see" approach that does not qualify as reasonable accommodation);[11] *Harris*, 2025 U.S. Dist. LEXIS 56112, *22 ("Courts recognize that reasonable accommodations must facilitate an employee's ability to perform their job, rather than alleviate the employee from those responsibilities altogether."). Besides the eviction duties, Defendants needed Gunther onsite regularly for her general administrative duties. Relying on others in the Boston office for those duties – e.g., answering the phone, responding to tenant concerns, filing personnel records, typing letters, assisting Bendetson with his computer needs, assistant McCourt with her personal needs – might have been manageable on occasion, but once per week indefinitely was simply not reasonable.

---

[10] The Defendants recognize that, according to EEOC regulations, a reasonable accommodation "may" include job restructuring and part-time or modified work schedules. 29 C.F.R. § 1630.2(o)(2). The regulatory language is, by its plain terms, permissive, not mandatory, indicating that whether a specific accommodation is reasonable depends on the facts of the case and not the regulation itself.

[11] Defendants recognize that was Gunther not requesting a full leave from work, but the operative fact is the lack of any end date to her requested accommodations. Defendants did not know *when* she would be available to work her full duties – indeed, her medical providers most likely could not know by the very nature of her cancer and its response to treatment.

iii. Granting Gunther's Accommodation Would Have Created An Undue Hardship.

The ADA does not require an employer to provide an accommodation that would create an undue hardship. 42 U.S.C. § 12112(b)(5)(A); *Ventura v. Hanitchak*, 719 F. Supp. 2d 132, 139 (D. Mass. 2010). For similar reasons that the requested accommodation was not reasonable, granting the accommodation requested by Gunther would have also created an undue hardship on Defendants. All the employees in the Boston office had full-time jobs with duties unrelated to the EAA position. Relying on temporary employee one day per week and other employees in the office indefinitely until her treatment ended would have not allowed the essential duties to be performed. *Ventura*, 719 F. Supp. 2d at 140 ("Given the problems the office had experienced as a result of the succession of untrained, temporary employees and the uncertainty surrounding Ventura's return, requiring it to hold her position open indefinitely would have posed an undue hardship."); *Harris*, 2025 U.S. Dist. LEXIS 56112, *22 (recognizing that delegation of functions to co-workers "fail to qualify as reasonable accommodations since they would fundamentally undermine [plaintiff's] role and potentially impose undue hardship on [employer]").

For all of the foregoing reasons, the Court should issue judgment in favor of Defendants on the claims for disability discrimination under 42 U.S.C. § 12112(a) and § 12112(b)(5).

B. The EEOC Cannot Succeed on Its Retaliation Claim.

To prevail on a claim of retaliation under the ADA, the EEOC must establish that (1) Gunther engaged in protected conduct; (2) Gunther experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action. *See Dickinson v. UMass Mem'l Med. Grp.*, 2011 U.S. Dist. LEXIS 30932, at *34 (D. Mass. Mar. 24, 2011).

18

An ADA retaliation claim that merely "repackages" a failure to accommodate claim fails as a matter of law, however. *See Hines v. Ellis Nursing Home, Inc.,* 2023 U.S. Dist. LEXIS 203462, at *14 (D. Mass. Nov. 14, 2023) (finding that plaintiff's claim that she was fired because she requested accommodation "is merely repackaging her claim that it failed to provide reasonable accommodation, which does not amount to retaliation"); *Rivera v. Altranais Home Care LLC*, No. 3:19-cv-30139-KAR, 2022 U.S. Dist. LEXIS 8355, at *52 (D. Mass. Jan. 18, 2022) ("A failure to accommodate cannot constitute retaliation for an employee's request for accommodation."). The allegations and the evidence show that the EEOC base its theory of retaliation on the Defendants refusal to accommodate, not on the actual request for accommodation. This theory has been soundly rejected; the claim cannot stand.

Furthermore, the course of events at the company after it learned about Gunther's medical condition undermines the EEOC's theory of retaliation. Gunther notified the company that she was facing medical issues <u>during</u> her interview process, before any job offer was made. SOF, ¶13. The company then made a job offer. Subsequently, Gunther notified the company that she was diagnosed with cancer. The company provided her with a full job description for her medical provider and requested information about any limitations or accommodations that she would need. After receiving the information initially, the company requested clarification on the accommodations. The company only determined that it could not provide the requested accommodations after this interactive process.

This is not retaliation. Allowing the EEOC's claim of retaliation to proceed would transform every decision by an employer that it could not grant an accommodation – not matter how reasonable or thorough the decision by the employer – into a claim of retaliation. The intervening acts of the Defendants' considering the accommodation, engaging in the interactive

process, and then determining the requested accommodation was not reasonable but would create an undue hardship breaks the causal chain. *Cf. Furtado v. Standard Parking Corp.*, 820 F. Supp. 2d 261, 273 (D. Mass. 2011) (finding intervening acts of misconduct between request for accommodation and adverse action "sever the causal connection (if any) between the protected conduct and the adverse employment decision").

## V. Conclusion

For the foregoing reasons, the Court should grant Defendant's Motion for Summary Judgment and enter Judgment on all counts in favor of Defendants.

DEFENDANTS ATLANTIC
PROPERTY MANAGEMENT CORP. and
DIVERSIFIED FUNDING, INC.,
By their attorneys,

/s/ Joseph Sulman
Joseph L. Sulman, BBO #663635
LAW OFFICE OF JOSEPH L. SULMAN
255 Bear Hill Road, Suite 204
Waltham, MA 02451
(617) 521-8600
jsulman@sulmanlaw.com

Dated: September 12, 2025

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all parties through their counsel of record on September 12, 2025 by ECF at the following addresses:

LINDSAY.SFEKAS@EEOC.GOV and GENA.MILLER@EEOC.GOV.

/s/ Joseph Sulman
Joseph L. Sulman

20