## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

**U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION**,

        Plaintiff,

    v.

**ATLANTIC PROPERTY MANAGEMENT
CORPORATION, and DIVERSIFIED
FUNDING, INC.**,

        Defendants.

Civil Action No.  1:24-cv-10370-AK

## PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION

### I.    INTRODUCTION

Plaintiff United States Equal Employment Opportunity Commission ("Plaintiff" or "EEOC") seeks partial summary judgment on the issue that Tiffany Gunther was an individual with a disability when Atlantic Property Management Corporation and Diversified Funding, Inc. ("Defendants") terminated her employment as an Executive Administrative Assistant ("EAA"). Plaintiff also respectfully requests that the Court reject Defendants' motion for summary judgment because there is sufficient evidence for a reasonable jury could find in the EEOC's favor on its claims that (1) Defendants failed to accommodate Ms. Gunther's disability by providing her scheduling flexibilities, such as time off or an earlier start time on days when she had chemotherapy appointments; (2) Defendants discharged Ms. Gunther because of her disability or the need to accommodate that disability; and, alternatively, (3) Defendants' termination of Ms. Gunther was retaliation for the protected activity of requesting disability-related accommodations.

### II.    BACKGROUND

Tiffany Gunther lost her job with an airline during the COVID-19 pandemic. Pl. Additional

Statement of Facts ("PSOF") ¶ 128. In August 2021, Ms. Gunther applied to be Defendants' EAA. Defs. Statements of Fact ("DSOF") ¶ 7. At the end of August 2021, she also started working part time as an administrative assistant for an executive at an unrelated company. PSOF ¶ 130. However, Ms. Gunther still needed full time work and sought a job that provided health-care coverage. PSOF ¶¶ 129, 133-34.

Defendants reviewed Ms. Gunther's resume and selected her for an interview in late August 2021. DSOF ¶ 7. Ultimately, Ms. Gunther interviewed with four of Defendants' leaders over two interview days: Cheryl Foote, Roberta Russo, Samantha McCourt, and Richard Bendetson. PSOF ¶ 154. Defendants sent Ms. Gunther an offer letter on September 22, 2021. PSOF ¶ 156. Defendants selected Ms. Gunther because she was the best candidate of all of the applicants for the job. PSOF ¶ 160. Defendants determined that Ms. Gunther was qualified for the EAA job. PSOF ¶¶ 156, 160. Ms. Gunther accepted the offer that day. PSOF ¶ 160-61. Defendants offered Ms. Gunther five days of paid sick leave per calendar year, and 1.5 hours of paid vacation time for every 80-hour pay period (the equivalent of about five vacation days per year). PSOF ¶ 157-159.

After Ms. Gunther's first interview with Defendants, she found a lump in her breast. DSOF ¶ 7; PSOF ¶ 135. First, she had a mammogram (PSOF ¶ 136) and then she was referred for biopsy. PSOF ¶ 142. The pathology report of the biopsy showed that the abnormal growth on her breast was invasive ductal carcinoma, grade 3. PSOF ¶ 142. On September 23, 2021, doctors explained to Ms. Gunther that she had cancer. PSOF ¶ 142. In other words, Ms. Gunther learned that she had cancer the day after she accepted the job with Defendants. PSOF ¶ 142, 156, 161.

On September 23, 2021, Defendants called Ms. Gunther to set her start date. PSOF ¶¶ 165-66. During the call, Ms. Gunther disclosed to Ms. Russo that she had cancer and would need surgery. PSOF ¶¶ 164-66. Then, Ms. Foote called Ms. Gunther telling her that Defendants now

needed to delay her start date. PSOF ¶ 167. But Defendants never actually gave Ms. Gunther a start date.

When Ms. Gunther was diagnosed with cancer, her medical team recommended a round of chemotherapy, to be followed by a surgery (likely a lumpectomy with sentinel lymph node removal), and then radiation. PSOF ¶¶ 143-44.

Chemotherapy appointments last for approximately three and a half to five hours. DSOF ¶ 139. Massachusetts General Hospital ("MGH"), where Ms. Gunther received treatment for cancer, offered chemotherapy infusion appointments at three different locations Monday through Saturday. PSOF ¶ 217. Initially, Ms. Gunther's medical team recommended that her first round of chemotherapy infusions occur weekly (PSOF ¶ 215) but approximately halfway through the first round of chemotherapy, they changed her regimen to infusions every three weeks. PSOF ¶ 215. Radiation therapy appointments are short, with the radiation itself taking approximately fifteen minutes, and they can be scheduled as early as 7:00 a.m. PSOF ¶¶ 217-172.

After learning that Ms. Gunther had cancer, Ms. Russo, deviating from her usual practice, continued to advertise the EAA position even though Ms. Gunther had already accepted the job. PSOF ¶¶ 156, 182, 172.

On September 30, 2021, Ms. Foote emailed Ms. Gunther requesting that she ask her medical providers to tell Defendants if she could complete the essential functions of the EAA. PSOF ¶ 168. Ms. Gunther promptly complied and sent a letter from her medical providers on October 6, 2021. PSOF ¶ 173; DSOF ¶ 42. In the letter, an oncology nurse, writing on behalf of Ms. Gunther's doctor wrote

> Tiffany Gunther is a patient under the care of Dr. Beverly Moy for the treatment of cancer. She is able to work during treatments and perform her job duties as an Administrative Assistant. She will need time off for treatment and intermittently for recovery as needed.

DSOF ¶ 42.

On October 7, 2021, the day after receiving this letter stating that Ms. Gunther would need time off for cancer treatment, Defendants began searching for replacement for Ms. Gunther. PSOF ¶ 174. Defendants reached out to at least one alternate candidate right away, who on October 7, 2021, confirmed to Ms. Russo that she could be available to meet the next morning. PSOF ¶ 174. Between October 8, 2021 and October 28, 2021 (the day that Defendants terminated Ms. Gunther), Ms. Russo messaged at least seven applicants who sought the EAA job and emailed herself the resumes of three candidates. PSOF ¶ 175-177. In that time, Mr. Bendetson also sent Ms. Russo the resume of another EAA candidate. PSOF ¶ 178.

After Ms. Gunther sent Defendants the medical letter, they did not respond, and so on October 8, 2021, Ms. Gunther asked Ms. Foote, "Is there anything else you need from me? Also, do you have a start date in mind? Thank you." PSOF ¶ 182. A few hours later, Ms. Foote responded, "We appreciate the letter from your doctor but would like some more detail," and that she would get back to her soon with a new request for more information from the doctor. PSOF ¶ 183.

Meanwhile, Ms. Gunther started her cancer treatment, having her first chemotherapy infusion on October 6, 2021. PSOF ¶ 212. Over the course of her first round of chemotherapy she had seven infusions in total. PSOF ¶ 214. Because she hoped to miss as little work as possible because of treatment, Ms. Gunther asked that her medical team schedule infusions on Fridays or Saturdays. PSOF ¶ 213. Ms. Gunther had most of her chemotherapy infusions on Friday afternoons, which did not conflict with her other administrative assistant job. PSOF ¶ 214.

Although Defendants had already begun looking for a replacement EAA, on October 13, 2021, they sent Ms. Gunther a request for more information about her treatment. PSOF ¶ 184. In

4

it, Ms. Foote wrote

> ["]We understand that the employee 'will need time off for treatment and intermittently for recovery as needed.' Please provide as much detail as possible about how frequently the employee will need time off for treatment, the length of any appointment for treatment, and the length of any periods of recovery.["]

PSOF ¶ 185, Ex. 16.

Ms. Gunther's medical team at MGH mailed Ms. Gunther a response to Defendants' request on October 19, 2021. PSOF ¶ 187, Ex. 17. Ms. Gunther emailed a copy of that letter to Defendants on October 26, 2021. PSOF ¶ 186; Ex. 17. That letter stated that Ms. Gunther

> is able to work during her treatments and perform her job duties as an Administrative Assistant. She will need time off for treatments, given weekly, approximately 4-6 hrs for visit/treatment. This will be followed by surgery and recovery (length TBD), and followed by visit/treatments, also approx 4-5 hr visits every 3 weeks for a year. She may require 1-3 unplanned days off or symptoms related to treatment intermittently, once a month.

Ex. 17. By October 26, 2021, when Defendants received this letter, Ms. Gunther had already received three of the seven chemotherapy infusions. Ex. 6 (med records page).

After receiving this letter, Defendants did not have any internal discussions about any impacts, financial or otherwise, that accommodating Ms. Gunther's treatment schedule might have on the company. PSOF ¶ 188-90.

On October 28, 2021, two days after receiving Ms. Gunther's second medical note, Defendants emailed Ms. Gunther to tell her they were firing her. PSOF ¶ 119. Ms. Foote wrote that Defendants were "very sorry regarding your cancer diagnosis and hope that the treatments go well...." Ex. 18.

Before firing Ms. Gunther, Defendants did not offer any accommodation or even discuss any potential accommodations with her. However, during this case, Mr. Bendetson admitted that Defendants could have accommodated Ms. Gunther with leave of four or five hours a week, a day a week of leave for five weeks, or a few hours of leave once a week. PSOF ¶ 198-200.

5

Ms. Gunther's sister Melissa Varner posted a GoFundMe page for her on October 21, 2021, to seek financial support for her. PSOF ¶¶ 204-205. Ms. Gunther asked Ms. Varner not to post anything about her job with Defendants or her breasts, Ms. Gunther did not approve of the dates or information in the post, but Ms. Varner posted it anyway. PSOF ¶¶ 206, 207, 210. Ms. Gunther pointed out errors in the GoFundMe post, but Ms. Varner did not correct them. PSOF ¶¶ 209-210. Ms. Varner did not consult Ms. Gunther's medical records or medical providers before writing it. PSOF ¶¶ 208-209. On October 22, 2021, Ms. Gunther sent a direct message to a friend, writing "Can you share this on your FB page?" and including a link to the GoFundMe fundraising page. PSOF ¶ 211.

After Defendants fired Ms. Gunther, she continued to work part-time in her existing executive assistant job and to look for work. PSOF ¶¶ 130-132, 227. In the spring of 2022, Ms. Gunther also began working as a temporary Payroll administrator for Axelia Partners, without any need for scheduling accommodation. PSOF ¶¶ 226, 229. In other words, Ms. Gunther was able to work two jobs, part-time and full-time, during this part of her treatment, without accommodation.

Ms. Gunther filed a charge against Defendants with the EEOC on June 30, 2022, and following an investigation, the EEOC filed this lawsuit. Compl., Doc. No. 1. In this litigation, Defendants represented to the Court that they would not contest that Ms. Gunther was disabled under the ADA. PSOF ¶ 84.  However, when the EEOC asked them to stipulate to that fact prior to this motion, they declined.

## III.    <u>**SUMMARY JUDGMENT STANDARD**</u>

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence "is such that a reasonable jury could

resolve the point in the favor of the non-moving party[.]" *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (quotation and citation omitted). Evidence is to be viewed in the light most favorable to the nonmoving party (*Tolan v. Cotton*, 572 U.S. 650, 657 (2014)) and all reasonable inferences must be drawn in favor of the nonmoving party (*see, e.g.*, *Murray v. Kindred Nursing Centers W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015)). On a motion for summary judgment, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence." *Roman v. Hyannis Air Serv., Inc.*, 156 F.4th 18, 24 (1st Cir. 2025) (quoting *Greenburg v. Puerto Rico Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987)).

## IV.    <u>ANALYSIS</u>

The EEOC claims that Defendants violated the ADA in several ways: failing to accommodate Ms. Gunther (*see* 42 U.S.C. §§ 12112 (a), (b)(5)(A)); discharging her because of her disability or the need to accommodate it (*see* 42 U.S.C. §§ 12112 (a), (b)(5)(B)); and, alternatively, discharging her in retaliation for requesting an accommodation (*see* 42 U.S.C. § 12203). It is undisputed that Defendants terminated Ms. Gunther's employment because of her disability, specifically the need to accommodate it. Defendants have said as much. *See* Def. Sum. J. Mem. of Law, Doc. No. 59, Pg. 9 n.4 ("DSJ MOL"). Defendants argue that summary judgment is nevertheless warranted on all of Plaintiff's claims because Ms. Gunther was not qualified to be the EAA and that they could not accommodate her disability without undue hardship. Defendants also contend the EEOC's retaliation claim is without merit.

In this motion, Plaintiff affirmatively seeks summary judgment on the question of whether Ms. Gunther had a disability under the ADA, an element both the accommodation and disability discharge claims. (As discussed below, this is not an element of the retaliation claim.)

Plaintiff also opposes Defendants' motion for summary judgment on all claims because

7

there disputes of fact on the issues that the Defendant raises in its motion.

### A.    Tiffany Gunther Had A Disability Within the Meaning of the ADA

The first element of both Plaintiff's disability termination claim and failure-to-accommodate claim is that Ms. Gunther was an individual with a disability under the ADA. *See Bailey v. Ga.-Pac. Corp.*, 306 F.3d 1162, 1166 (1st Cir. 2002) (termination claim); *Valle-Arce v. P.R. Auth.*, 651 F.3d 190, 198 (1st Cir. 2011) (failure to accommodate). Under the ADA, the term "disability" means "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). The statute requires that disability "shall be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A). The definition of major life activities includes "major bodily functions," such as "functions of the immune system, *normal cell growth*, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions. 42 U.S.C. § 12102 (2)(B) (emphasis added); *see also* 29 C.F.R. § 1630.2(g)(1)(i), (i)(1)(ii). It is undisputed that Ms. Gunther had Invasive Ductal Carcinoma (i.e., breast cancer) at the time Defendants terminated her and that cancer is an impairment that substantially limited her normal cell growth. PSOF ¶¶ 142-43. *See* 42 U.S.C. § 12102 (2)(B); *see also* 29 C.F.R. § 1630.2(j)(3)(iii) ("it should easily be concluded that . . . cancer substantially limits normal cell growth").

Although an impairment need limit only one major bodily function, it is also undisputed that Ms. Gunther's Invasive Ductal Carcinoma limited other such functions. During her cancer treatment, which lasted over a year, Ms. Gunther experienced: hair loss; nausea; dermatitis; diarrhea; headaches. PSOF ¶¶ 145-48. Her treatment—which under the ADA is considered part of the impairment itself—also limited several major bodily functions under the ADA. *See* 42 U.S.C. § 12102 (major bodily functions).

It is undisputed that Ms. Gunther had cancer, and that her cancer constituted a disability

under the ADA. Summary judgment in the EEOC's favor is appropriate on this issue.

### B.    The Court Should Deny Defendants' Motion Entirely.

Defendant's contention that Ms. Gunther was not qualified for the EAA job, which is an element of both the failure to accommodate and disability discharge claims, is without merit. Defendant's other asserted grounds for the failure to accommodate claim, that the accommodations sought were not reasonable and would impose undue hardship, are also incorrect. Since the jury could find for the EEOC on those issues, there is also no basis for granting summary judgment on the EEOC's disability termination claim. Finally, Defendant's grounds for summary judgment on the retaliatory termination claim are also without merit.

### 1.    Ms. Gunther Was Qualified.

A "qualified individual" under the ADA is someone who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Essential functions do "not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). Whether a person is a qualified individual, depends on whether the individual can perform the essential functions of the position and, if she is unable to perform the essential functions, whether she could with a reasonable accommodation. *See, e.g. Flaherty v. Entergy Nuclear Operations, Inc.*, 946 F.3d 41, 53 (1st Cir. 2019).

Record evidence shows that Ms. Gunther could perform the essential functions of the EAA job. It is undisputed that Ms. Gunther was generally qualified for the role. PSOF ¶ 160. Ms. Gunther had extensive work experience with large teams and organizing complex administrative tasks. PSOF ¶ 160; Ex. 2. Ms. Gunther's medical providers reviewed Defendants' list of essential functions for the role and thought she was qualified for the job during her cancer treatment. Exs. 12, 17. Ms. Gunther wanted to start working for Defendants while she was undergoing treatment and testified to the same. *See* Ex. 15. She also looked for jobs throughout her treatment. That Ms.

9

Gunther continued to work as an administrative assistant throughout her treatment shows that she could perform this type of work throughout this period. Further, because Defendants have employed other EAAs who worked on an early schedule or took time off to care for loved ones shows that an employee can perform the functions of the job with such scheduling modifications.

Defendants argue that Ms. Gunther was not qualified because she could not be trained in evictions and that her absences would be so extensive that she could not perform the essential function of regular attendance. Defendant is incorrect for three reasons: a) a reasonable jury could find that evictions work was a marginal rather than essential function of the EAA job; b) even if evictions work was essential, occasional absences for treatment would not have prevented Ms. Gunther from being trained on it, since the training that Defendants contend takes months was informal and actually took only a matter of hours, and c) the modest number of mostly scheduled absences that Ms. Gunther's treatment required do not render her unable to perform the essential function of attendance under First Circuit caselaw. Finally, two out-of-court statements that Defendant claims show Ms. Gunther was entirely unable to work are inadmissible hearsay, and in any event do not support summary judgment, because a jury would not be required to credit them.

### a)      *Evictions Work Was Not An Essential Function of the EAA Job.*

"An 'essential function' is a fundamental job duty of the position at issue . . . [and] does not include the marginal functions of the position." *Mulloy v. Acushnet Co*., 460 F.3d 141, 147-48 (1st Cir. 2006) (quoting *Kvorjak v. Maine*, 259 F.3d 48, 55 (1st Cir. 2001)). If a jury could conclude that evictions work was not an essential function of the EAA job, then Ms. Gunther would be qualified for the EAA job even if, as Defendant contends, she could not be trained on that function.

An employer's judgment about whether a particular job function is essential is a significant factor in the analysis, but as Defendants concede, is not dispositive. *See Jones v. Walgreen Co*.,

679 F.3d 9, 14 (1st Cir. 2012); DSJ MOL at 15. The ADA provides that "*consideration* shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111 (emphasis added). But other factors, including the time spent on the job performing the function; the consequences of not requiring the incumbent to perform the function; and the experience of past incumbents in the job, are also relevant evidence. *See* 29 C.F.R. § 1630.2 (n)(3).

Here, there is ample evidence to allow a jury to find that evictions were not an essential function for EAAs. Ms. Foote testified that EAAs worked on evictions an average of just five hours per week. PSOF ¶ 106. The work experience of past incumbents suggests that this estimate was a ceiling and that some EAAs did not do evictions work at all: Temporary employees served as EAAs for extended periods and did not work on evictions. A jury could infer from this that the consequences of not assigning evictions work to an EAA were, at best, modest. Moreover, during most of the period that Ms. Gunther was in treatment, there was a moratorium on evictions in approximately half of Defendants' Massachusetts properties, further reducing the consequences of this work not being assigned to an EAA temporarily during that period. PSOF ¶¶ 115-118.

Evidence that evictions were a marginal, rather than essential, function of the job is not limited to temporary EAAs. Defendants did not begin to train Elizabeth Roesel, Ms. Gunther's replacement, in evictions until she had worked there for six months. SOF ¶ 35-36. Where a particular training requirement has no "hard deadline," a jury could reasonably conclude that it is not essential to be performed immediately upon hire. *See Fitzgerald v. City of Lawrence*, No. CV 22-11840-JCB, 2024 WL 4859014, at *10 (D. Mass. Nov. 21, 2024) (no conclusive evidence that it was an essential function of plaintiff's job to complete fire academy training within one year).

11

**b)**     *There is Evidence that Evictions Training Required Hours, Not Months, and So Ms. Gunther Could Easily Complete It.*

Even if training in evictions work were an essential function of this job, a reasonable jury could find that she would have had ample time to be trained in evictions. Although Defendants contend that missing part of a day of work once per week or per month would have prevented Ms. Gunther from getting such training, there is evidence to the contrary.

Almost all of Ms. Gunther's absences could be scheduled in advance and involved being absent for only part of one day per week or per month. Given the flexible, individualized, ad hoc nature of Defendants' eviction training, Ms. Gunther would not have needed to miss any evictions training for her treatment.

Defendants point to Ms. Russo and Mr. Bendetson's testimony that evictions training takes "months," and suggests that this means this training is so time consuming that any absences from the workplace whatsoever would make it infeasible to complete. The evidence does not support that contention. Instead, the evidence shows that the training takes a few hours all told, and only takes "months" because Defendants conduct the training only sporadically. Ms. Russo conducts Defendants' eviction training for EAAs, which lasts for a few hours at a time. *See* PSOF ¶ 101-103. Former Executive Administrative Assistant Elizabeth Roesel recalled that she had approximately four hours of evictions training during the entire time she worked for Defendants. *See* Ex. 20 ¶ 16. Ms. Russo trained EAA Rebecca Foote in about a month. PSOF ¶ 102.

The one-on-one evictions training consists of Ms. Russo demonstrating the steps of an eviction. Ms. Russo schedules the training based on her schedule, EAA's schedule, and the Defendants evictions. PSOF ¶ 94. Ms. Russo has at times delivered evictions training via Zoom and so it could even be done without being physically present in the office. PSOF ¶ 105.

Defendants' eviction training had neither rigid time constraints nor voluminous material.

Despite conclusory testimony that Ms. Gunther could not have been trained in evictions during her cancer treatment, the evidence would permit a jury to conclude otherwise.

### c)        Ms. Gunther Could Fulfill the Essential Function of Attendance

Ms. Gunther's treatment schedule would not have caused the sort of extensive, prolonged, and unpredictable absences that the First Circuit has found to render an employee unqualified based on inability to regularly attend work. Preliminarily, a reasonable jury could find that Ms. Gunther was a qualified individual who did not need an accommodation at all. *See* 42 U.S.C. § 12111(8) (a "qualified individual" can perform the essential functions of a position "*with or without* reasonable accommodation") (emphasis added). It is possible that the ten days of sick time and vacation time that Defendants already offered to all employees each year would have provided Ms. Gunther all of the time off she needed for her chemotherapy infusions, which she could schedule on Saturdays, her lumpectomy, an outpatient surgery from which she recovered in three days, and radiation, which she could receive before work hours. PSOF ¶¶ 158-159, 212-225.

The ADA specifically provides for scheduling flexibility as a means of accommodating qualified individuals with disabilities. *See* 42 U.S.C. § 12111(9). The statute expressly states that a "reasonable accommodation" may include "part-time or modified work schedules." 42 U.S.C. § 12111(9)(B); *accord Benson v. Wal-Mart Stores E., L.P*, 14 F.4th 13, 28 (1st Cir. 2021) (under the ADA, "a modified work schedule is a classic reasonable accommodation"). Although some caselaw observes that "attendance is an essential function of any job," this does not mean that an individual with a disability can never take a sick day without losing the ADA's protection. *See, e.g.*, *Benson*, 14 F.4th at 20-25, 27-28. Fact-sensitive issues determine how much work an employee may miss and still be qualified for the role. *Colon-Fontanez v. Mun. of San Juan*, 660 F.3d 17, 34 (1st Cir. 2011) (*quoting Rios-Jimenez v. Principi*, 520 F.3d 31, 42 (1st Cir. 2008)); *see*

*Ward v. Mass. Health Rsch. Inst., Inc.,* 209 F.3d 29, 35 (1st Cir. 2000) (whether a particular schedule or shifts attended is an essential function is "fact-intensive inquiry into the pattern of the attendance problem and the characteristics of the job in question").

A failure to fulfill the essential function of attendance generally involve absences that greatly exceed the those already permitted by an employer. The plaintiff in *Colon-Fontanez* had an extensive history of absenteeism and was not qualified to fulfill the essential function of attendance either before or after her fibromyalgia diagnosis. 660 F.3d at 33. In *Serrano-Colon v. United States Dep't of Homeland Sec.*, 121 F.4th 259, 264-68, 278-79 (1st Cir. 2024), the unqualified employee also had an extensive history of absenteeism before and after her disability diagnosis, including fifty-four unscheduled absences in a five-year period and many absences she called in within an hour of starting her shift. *Id.* at 264-68. That plaintiff also took 61.75 hours of leave without pay and 23 hours of sick leave even *after* she was granted a modified schedule. *Id.* at 267. By contrast, Ms. Gunther may have needed an earlier start time, several scheduled hours off on treatment days, and occasional time off for recovery.

Allowing some absences and even some tardiness may be a facially reasonable accommodation. In *Benson*, the First Circuit remanded for further proceedings to resolve the question of whether the plaintiff, who was absent, left early, or arrived late to work on twelve occasions in a three-month period and then had additional absences the following month, could have been qualified for work with the accommodation of some authorized absences and tardiness. *See* 14 F.4th at 28. *See also Burnett v. Ocean Props., Ltd.*, 327 F. Supp. 3d 198, 234 (D. Me. 2018) (plaintiff may be qualified even though he was frequently tardy).

If Ms. Gunther needed an accommodation of occasional additional time off and/or a modified schedule, she needed less of it and needed it more predictably than the plaintiffs in the

14

First Circuit cases in which an employee was found not qualified because of attendance. Ms. Gunther' medical providers also wrote in the October 19 note that she "may require 1-3 unplanned days off for symptoms related to treatment intermittently." This is the *only* time off that Ms. Gunther's medical team identified that she could not plan weeks in advance.

Most of Defendants' EAAs worked from 8:30 a.m. until 4:30 p.m. When Defendants received Ms. Gunther's October 19 note stating that her infusions were four to five hours each, she had already received three of the seven infusions she had during the first round of chemotherapy. Therefore, even if Ms. Gunther had done nothing to schedule her care around her work schedule, she would have missed a *maximum* of twenty total work hours after this note. This is many fewer absences or modified shifts than the plaintiff in *Benson. See* 14 F.4th at 28.

But Ms. Gunther would not necessarily have missed work hours at all for her infusions and even if she did, it would not necessarily have been five work hours per infusion. She could have scheduled her infusions on Saturdays (SOF ¶¶ 143, 148) or on weekday afternoons to miss fewer working hours, especially if she had a modified schedule with an earlier starting and ending time, like Ms. Toste. PSOF ¶ 91. Because Ms. Gunther's treatments were scheduled in advance, accommodating them would have been less of a hardship of accommodating the unpredictable, last-minute absences of the unsuccessful plaintiff in *Serrano-Colon. See* 121 F.4th at 265 (plaintiff failed to provide even an hour's notice of absences at least seven times in nine months).

Ms. Gunther's medical team also anticipated that she would need a second round of chemotherapy, then a surgery that would be "followed by visits/treatments, also approx. 4-5 hr visits, every 3 weeks for year." DSOF ¶ 45. As discussed above, Ms. Gunther could have scheduled her second round of chemo on weekends or used a modified schedule, and her surgery only kept her off work for about two days. PSOF ¶¶ 217, 225.

The brief and mostly planned absences Ms. Gunther needed for cancer treatment are not a basis for finding her unqualified as a matter of law.

### d) Defendants' Inadmissible Evidence, Which Would Not Be a Basis for Summary Judgment If Admitted, Should Not Be Considered.

Defendants also rely on two pieces of inadmissible evidence to suggest that Ms. Gunther was unable to work *at all* for several months when Defendants fired her: a GoFundMe post her sister wrote and an email Ms. Gunther sent to a staffing company turning down an interview for a different, temporary job. But "[a] genuine issue of material fact can be created only by materials of evidentiary quality." *Hannon v. Beard*, 645 F.3d 45, 49 (1st Cir. 2011). Because neither item would be admissible at trial, they cannot be considered at summary judgment, either.

Even if these items were admissible, they do not in any event warrant summary judgment. Viewing the evidence in the light most favorable to the EEOC, neither item would compel a reasonable jury to find that Ms. Gunther, who was actually employed throughout this period, was unable to work at all.

### (1) The GoFundMe Post Is Inadmissible and In Any Event A Jury Could Decide Not to Credit It.

The GoFundMe post that Ms. Gunther's sister wrote is inadmissible hearsay because it is an out-of-court statement Defendants offer for truth of matters asserted in the post, and no exceptions to the rule against hearsay apply.

Hearsay is an out of court statement offered for the truth of the matter asserted in the statement. *See* Fed. R. Evid. 801(c). Save certain exceptions outlined in Rules of Evidence 803-804, hearsay is inadmissible. Fed. R. Evid. 802. Rule 801(d)(2) defines different types of statements to be nonhearsay when the declarant is the opposing party or its representative, authorized speaker, agent, employee, or coconspirator. Relevant here, Rule 801(d)(2)(B) specifies that a statement offered against an opposing party that "the *party* manifested that it adopted or

believed to be true" is not hearsay, and therefore not subject to the Rule Against Hearsay. Fed. R. Evid. 801(d)(2)(B) (emphasis added). To be an adoptive admission, the person sharing or acquiescing to the statement must manifest her agreement with the content of the statement at issue. *See Ratcliffe v. BRP U.S., Inc.*, No. 1:20-CV-00234-JAW, 2024 WL 4700048, at *5-6 (D. Me. Nov. 6, 2024) (video published "on its public-facing platforms and its independent assertion that [the video declarant's] reliability function as adoption the statements made in the video"); *Sea-Land Serv., Inc. v. Lozen Int'l, LLC*, 285 F.3d 808, 821 (9th Cir. 2002) (sender's preface to a forwarded message "Yikes, Pls note the rail screwed us up…" indicated her agreement with the content of the message and was an adoptive admission).

As an initial matter, none of the provisions of Rule 801(d) apply here because the EEOC is the plaintiff in this action, not Ms. Gunther and not her sister. Rule 801(d)(2) outlines different types of statements that are not hearsay when the declarant is the opposing party or its representative, authorized speaker, agent, employee, or coconspirator: Ms. Gunther and her sister are none of these. It is well-established that when the EEOC files suit to enforce the law, it is not merely a proxy for the victims of discrimination harmed by the violation. *See General Telephone Co. of the Nw. v. E.E.O.C.*, 446 U.S. 318, 326 (1980) ("the EEOC is not merely a proxy for the victims of discrimination"); *Karp v. CIGNA Healthcare, Inc.*, 882 F. Supp. 2d 199, 208 n.12 (D. Mass. 2012) (same). Here, the EEOC, *not* Ms. Gunther, the individual who purportedly adopted this statement, is the party. *See E.E.O.C. v. Rent-A-Center E. Inc.*, 303 F. Supp. 3d 739, 743 (C.D. Ill. 2018) ("Aggrieved individuals in this context are not parties to the litigation, and they cannot therefore be an 'opposing party' within the Rules of Evidence."). Nor is Ms. Gunther the "real party in interest"; that, too, is the EEOC. *Id.* at 744. The EEOC has never adopted or acquiesced to this statement. *See* Fed. R. Evid. 801(d)(2) 1972 Advisory Committee note.

As an initial matter, the adopted admission exception is inapplicable to the GoFundMe post because the EEOC never "manifested that she adopted or believed to be true." *See* Fed. R. Evid. 801(d)(2)(B). Even if Ms. Gunther were a party to this action, which she is not, there is evidence that she, too, did not adopt the content of the GoFundMe post. Although Ms. Gunther sent the link to a friend, writing, "Will you share this on your FB page?", this is akin to a website posting an article: A desire to publicize a statement falls short of Rule 801(d)(2)(B)'s requirement that the individual manifest her adoption of the statement. *See Parker v. Winwood*, 938 F.3d 833, 837 (6th Cir. 2019) (posting an article on a website was not a manifestation of adoption of the entire article); *see also United States v. Johnson*, 280 F. Supp. 3d 772, 773 (D. Md. 2017) (message with a video post did not indicate adoption of the whole video).

The GoFundMe post also should not be admitted under the residual exception to hearsay. Hearsay not specifically covered by a hearsay exception may be admissible under the residual exception if the statement has equivalent circumstantial guarantees of trustworthiness, is offered as evidence of a material fact, is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts and admitting it will best serve the purposes of these rules and the interests of justice. Fed. R. Evid. 807. Evidence is very rarely admissible under the residual exception and "only in exceptional circumstances." *Bradley v. Sugarbaker*, 891 F.3d 29, 34 (1st Cir. 2018) (quoting *United States v. Benavente Gómez*, 921 F.2d 378, 384 (1st Cir. 1990)). " . . . [W]hether the 'proffered evidence possesses circumstantial guarantees of trustworthiness equivalent to those possessed by the other listed exceptions to the hearsay rule is the most important part of this inquiry." *Id.*, 891 F.3d at 34; *see also NGM Ins. Co. v. Santos*, 483 F. Supp. 3d 1, 8 (D. Mass. 2020) (statement to insurance adjuster that declarant knew was recorded but was not under oath lacked sufficient guarantees of trustworthiness to be

18

admissible under the residual exception).

Defendants offer no analysis of residual exception standards and instead conclude it is satisfied because "Gunther had no ulterior motive" to make the statements. Setting aside that Ms. Gunther did not actually make the statements in the GoFundMe post, this conflates "ulterior motive" with reliability. The hearsay rule is concerned with the latter, and even in the absence of an "ulterior motive," there are many reasons out-of-court statements may be unreliable when offered for their truth. "The hearsay rule is generally said to exclude out-of-court statements offered for the truth of the matter asserted because there are four classes of risk peculiar to this kind of evidence: those of (1) insincerity, (2) faulty perception, (3) faulty memory and (4) faulty narration. . . ." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 232 (2d Cir. 1999). "The hearsay rule ordinarily prohibits the admission of out-of-court statements by declarants on the theory that cross-examination can help test for these four classes of error, thus allowing the fact-finder to weigh the evidence properly and to discount any that is too unreliable." *Id.*

While it may not suffer from insincerity, the GoFundMe post exhibits all three of the other errors the hearsay rule is designed to prevent: Ms. Gunther pointed out errors in the post, which Ms. Varner ignored; Ms. Gunther did not approve of the dates or information in the post; and Ms. Varner did not consult Ms. Gunther's medical records medical providers before writing about Ms. Gunther's medical condition. In short, the post was a well-meaning but factually unreliable fundraising post by a relative. It is not supported by sufficient guarantees of trustworthiness.

Even if the GoFundMe post were admissible, it is not a basis for granting summary judgment on the issue of whether Ms. Gunther was qualified. For the same reasons that the GoFundMe post lacks the guarantees of trustworthiness to be admitted under the residual exception, a reasonable jury could decide not to credit the statements in the GoFundMe post and

19

could instead credit conflicting evidence. Because summary judgment does not allow for credibility determinations, it is not warranted here. *See Greenburg*, 835 F.2d at 936.

### (2)    The November 5 Email Is Inadmissible and In Any Event Does Not Require Summary Judgment.

Ms. Gunther's November 5, 2021 email is also not a statement of a party opponent and should not be considered an adoptive admission of the EEOC. As previously discussed, Ms. Gunther, is not a party in this case. *See, e.g.*, *General Telephone*, 446 U.S. at 326. Ms. Gunther is neither the EEOC's employee nor its agent, as Rule 801(d) contemplates. *See Rent-A-Center E. Inc.*, 303 F. Supp. at 743-44; *but see E.E.O.C. v. Placer ARC*, No. 2:13-CV-0577-KJM-EFB, 2016 WL 74032, at *2 (E.D. Cal. Jan. 7, 2016) (although the charging party was not a party to the litigation she was a "witness plus" and admissible as an adoptive admission, though the statements would also likely be admissible on other grounds); *E.E.O.C. v. Triangle Catering, LLC*, No. 5:15-CV-00016-FL, 2017 WL 818261, at *3 (E.D.N.C. Mar. 1, 2017) (subscribing to the analysis in *Placer Arc* regarding whether the statement of a charging party could be an adoptive admission attributable to the EEOC). Even if the Court finds that the EEOC had some kind of agency relationship with Ms. Gunther, that relationship could not possibly have begun until Ms. Gunther filed her charge with the EEOC about a year after she sent this link.

Defendants also argue, incorrectly, that the November 5, 2021 email is admissible as a statement of a "then existing . . . physical condition." Fed. R. Evid. 803(3). But the hearsay exception in Rule 803(3) does not permit use of this email as evidence of Ms. Gunther's physical condition *at other points in time*. Rule 803(3) provides that "[a] statement of a declarant's then-existing . . . emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health). . . ." *Id.* This "exception is not a sweeping endorsement of all state-of-mind evidence." *United States v. Sabean*, 885 F.3d 27, 41 (1st Cir. 2018) (internal quotation marks omitted).

20

The First Circuit has endorsed the advisory committee notes' comment that the Rule 803(3) exception requires "substantial *contemporaneity of event and statement.*" *United States v. Rivera-Hernandez*, 497 F.3d 71, 81 (1st Cir. 2007) (emphasis in original). In *Rivera-Hernandez*, the defendant sought to use a hearsay statement as evidence of the intent of an agreement made a couple months later. *Id.* at 74-75. The First Circuit held that this did not satisfy the contemporaneity requirement, citing with approval an Eighth Circuit case that rejected application of Rule 803(3) to a "statement was made a day after the" event at issue. *Id.* at 82 (citing *U.S. v. Naiden*, 424 F.3d 718, 721-23 (8th Cir. 2005)). Rule 803(3)'s contemporaneity requirement does not permit Defendants to use the November 5, 2021 email as evidence that she could not work either a month *prior* to the e-mail (when Defendants fired her) or "a few months" into the future.

The November 5, 2021 email is also inadmissible under the residual exception to hearsay for many of the same reasons as the GoFundMe post: it is an out-of-court statement without context and without any of the guarantees of trustworthiness the various exceptions to the hearsay demand.

Even if the November 5, 2021 email were admissible, it would not serve as a basis for summary judgment. A reasonable jury would not be required to draw the inferences from the email that Defendants suggest. Defendants argue that the email is proof that Ms. Gunther "was unable to work 'for a few months.'" DSJ MOL at 10. A jury could credit contrary evidence instead. Ms. Gunther was, in fact, working throughout this period, applying for other jobs, and her medical team said that she could work during treatment. PSOF ¶ 227; Exs. 12, 17, 23. A factfinder could also conclude that the November 5, 2021 email did not literally mean Ms. Gunther was unable to work for months, but rather that it was a face-saving or polite was to turn down an interview for a job that did not interest her. Relying on all of the evidence in the record, a jury construing the evidence in the light most favorable to the EEOC and drawing all reasonable inferences in its favor

could reject Defendants' contention that Ms. Gunther was unable able to work "for a few months."[1]

For all of the foregoing reasons, Defendant has not demonstrated that Ms. Gunther was unqualified as a matter of law, and summary judgment on that ground is unwarranted.

### 2.    *Defendants Failed to Accommodate Ms. Gunther.*

Defendants also move for summary judgment on Plaintiff's failure to accommodate claim on the grounds that the accommodations Ms. Gunther needed were not reasonable and that accommodating her disability would have been an undue hardship. *See* DSJ MOL at 16-18.

"To withstand summary judgment on a failure-to-accommodate claim, a plaintiff must point to sufficient evidence showing that (a) he is disabled within the ADA's definition; that (b) he could perform the job's essential functions either with or without a reasonable accommodation; and that (c) the employer knew of h[is] disability, yet failed to reasonably accommodate it." *Eaton v. Town of Townsend*, No. 22-1334, 2023 WL 3317986, at *11 (1st Cir. May 9, 2023) (cleaned up) (quoting *Lang v. Wal-Mart Stores E., L.P.*, 813 F.3d 447, 454 (1st Cir. 2016)).

Under the ADA, an "undue hardship" is "an action requiring significant difficulty or expense" when considering several different factors, including the cost of the accommodation, the nature of the accommodation, the employer's resources at the facility, overall financial resources of the employer, and the nature of the operation where the covered individual would work. 42 U.S.C. § 12111 (10). The burden to show undue hardship always remains with the employer.

---

[1] Even if a reasonable jury had no choice but to credit the November 5, 2021 email for the proposition that Defendants press, this would not support summary judgment on liability. A jury would still be free to conclude that the email shows only that some time weeks after Defendants fired her, Ms. Gunther became unable to work. This is not evidence that was obtained by Defendants during litigation and that, therefore, could not actually have motivated Defendants at the time of their decision to fire Ms. Gunther. This may operate as an equitable limit on lost wages, but it would not show that Ms. Gunther was unqualified at the time Defendants fired her. In cases where a reason to fire an employee is later discovered by an employer during litigation, this serves only to cut off backpay, not to absolve the defendant of liability for employment discrimination. *Cf. McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362-63 (1995) (after-acquired evidence of employee wrongdoing).

22

*Reed v. LePage Bakeries, Inc*., 244 F.3d 254, 258 (1st Cir. 2001); *see Ward*, 209 F.3d at 37 (employer must produce "some modicum of evidence" that implementing it would be a hardship, financial or otherwise).

There is no dispute that Ms. Gunther had a disability. There is evidence that she was qualified for the EAA job and that she could perform the essential functions with or without an accommodation. There is no dispute that Defendants did not provide any accommodation and the parties also agree that Defendants were aware that Ms. Gunther had cancer and was seeking treatment for it at the time they terminated her employment.

Defendants' arguments on the remaining elements of this claim are without merit: The accommodations that would have enabled Ms. Gunther to work as an EAA are precisely the sort envisioned by the text of the ADA and thus are facially reasonable and there is evidence that would permit a reasonable jury to reject Defendants' contention that accommodating Ms. Gunther's disability would impose an undue hardship on them.

### a)      *Additional Time Off, If Necessary, and an Earlier Schedule on Treatment Days Were Facially Reasonable Accommodations.*

Periodically having a day or partial day off of work for treatments and recovery or an adjusted schedule on infusion days are facially reasonable accommodations.

"[T]o defeat a defendant/employer's motion for summary judgment[, a plaintiff] need only show that an 'accommodation' seems reasonable on its face, *i.e.,* ordinarily or in the run of cases." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002); *see also Echevarría v. AstraZeneca Pharm. LP*, 856 F.3d 119, 127 (1st Cir. 2017); *see also LePage Bakeries*, 244 F.3d at 259; *accord Barnett*, 535 U.S. at 402.

The ADA specifically contemplates that scheduling flexibility may be a reasonable accommodation.  42 U.S.C. § 12111(9)(B)  (part-time  or  modified  work  schedules  may  be  a

reasonable accommodation); *Benson*, 14 F.4th at 28 (under the ADA, "a modified work schedule is a classic reasonable accommodation"); *Sutherland v. Peterson's Oil Serv., Inc.*, 126 F.4th 728, 744 (1st Cir. 2025) (that employer had a worker on the schedule the plaintiff requested as an accommodation allowed a factfinder to conclude that the accommodation was reasonable).

Remote work may also be a reasonable accommodation. *See Lewis v. T-Mobile USA, Inc.*, No. 1:21-CV-00224-GZS, 2023 WL 315695, at *7 (D. Me. Jan. 19, 2023) (although the defendant said that in-person work was an essential function and listed it on the job description, it was an issue for factfinder whether remote work was a reasonable accommodation for a job).

In addition to time off on treatment days, modified work hours, such as starting and ending work earlier on treatment days, also may have assisted Ms. Gunther perform her EAA duties. An earlier start time to her schedule on infusion days so that she would have missed at most three work hours on chemotherapy infusion days and it is reasonable because Defendants offered it to an EAA who did not have a disability, Jessica Toste, to care for her children. PSOF ¶ 91. Defendants also allowed a previous EAA to leave work early to care for a loved one. *See* Ex. 20 ¶ 8. Defendants scheduling modifications for other EAAs show that modified work hours for Ms. Gunther would have been a feasible and facially reasonable accommodation. *See Sutherland*, 126 F.4th at 744.

Defendants also could have accommodated Ms. Gunther with occasional remote work, since Ms. Russo did some of the evictions training over Zoom.

### b) *Accommodating Ms. Gunther's Cancer Treatment Would Not Have Imposed an Undue Hardship on Defendants.*

There is a triable issue of fact as to whether additional time off and/or an earlier schedule on treatment days would have been an undue hardship for Defendants. Indeed, Defendants' President stated that they could have provided such accommodations. PSOF ¶¶ 198-200.

24

A jury could find that Defendant has not come close to meeting its burden on this affirmative defense. Defendants failed to point to evidence that an earlier schedule on a few treatment days would have impacted its operations. Similarly, a jury could reject the contention that granting Ms. Gunther some sick days or partial sick days for treatment would impose an undue hardship. Ms. Gunther would have earned five sick days per calendar year and approximately 1.5 hours of vacation time per pay period, which likely would have covered most of Ms. Gunther's need for time off. In fact, Defendants' President stated that they also could have provided such an accommodation. PSOF ¶¶ 198-200.

Defendants already schedule their evictions training around Ms. Russo and the EAA's schedule, so scheduling them around Ms. Gunther's treatments would not have been a hardship.

Moreover, there is no concrete evidence that accommodating Ms. Gunther would entail any particular cost to Defendants, much less how much of a cost that might be. This undermines Defendants' undue hardship argument. Most of the statutory factors regarding whether an accommodation is an undue hardship depend on the cost to employer in light of their overall resources. 42 U.S.C. § 12111(10)(B). It is reasonable to infer that Defendants have significant financial resources: Mr. Bendetson estimated that 95% of the investments that generate his seven-figure annual income derive from Defendants. PSOF ¶¶ 85-86.

Defendants also overstate the extent of the accommodation that Ms. Gunther would have needed, improperly assuming she needed an accommodation of one day of leave per week "indefinitely until her treatment ended . . . ." DSJ MOL at 18. Ms. Gunther never asked for—or needed—one day per week off until her treatments ended. Rather, during a year-long treatment plan, Ms. Gunther only needed weekly time off during an initial phase of treatment which lasted two months. The time needed for weekly treatment was a matter of hours, not a full day. During a

later phase of treatment, Ms. Gunther had chemotherapy infusions once every three weeks.

Defendants' suggestion that Ms. Gunther's need for accommodations was "indefinite" are simply wrong.  To the extent Defendants thought Ms. Gunther would need a day of leave for the first part of her treatment, that period could only possibly have lasted until she had surgery. The October 19 note states that Ms. Gunther would have one round of treatment, surgery and recovery, and then another round of treatment all within one year. This is a definite period of time. Regardless, in certain circumstances, an accommodation of extending leave in increments may be reasonable. *See Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 648 (1st Cir. 2000) (employee's request for leave extension to a specific end date, was a reasonable accommodation, the employer had been using temporary workers, and there was no evidence that the date of the extended release would have been a hardship to the employer); *Criado v. IBM Corp.*, 145 F.3d 437, 444 (1st Cir. 1998) (fact issues remained as to reasonableness of a leave request of an employee who sought temporary leave to allow her physician to design an effective treatment program).[2]

Defendants failed to provide evidence that would require a reasonable jury to conclude that granting Ms. Gunther a sick day or partial sick day once a week or once a month, alone or in combination with an earlier start time on infusion days would have been an undue hardship.

---

[2] To the extent Defendants claims it lacked even finer-grained detail about Ms. Gunther's scheduling needs, any fault on that front lies with Defendants. Employers have some responsibility to determine the necessary accommodation. *See Sutherland*, 126 F.4th at 743. While an employer may defend against a failure-to-accommodate claim where it can provide evidence that it engaged in good faith in the interactive process and the employee was responsible for the breakdown of that process, that is not what occurred here. *See, e.g., E.E.O.C. v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014). Here, every time Defendants asked for information about Ms. Gunther's accommodations, she promptly responded. Defendants had the information they needed to accommodate Ms. Gunther, but if they needed more, all they had to do was ask.  An employer cannot prove undue hardship by terminating the interactive process and then claiming uncertainty.

Summary judgment on this affirmative defense is not warranted.

### 3. Defendants Discharged Ms. Gunther Because of Her Disability or the Need to Accommodate Her Disability

To prevail on a claim of discharge because of disability, the EEOC must show that Ms. Gunther was (1) disabled under the ADA; (2) a qualified individual; and (3) discharged because of her disability. *See Sutherland*, 126 F.4th at 728, 738. The ADA defines discrimination because of disability to include "discrimination based on the need to accommodate a disability. *See* 42 U.S.C. § 12112(b)(5)(B) (prohibiting the denial of "employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant").

The EEOC seeks summary judgment on the first prong in this motion. Defendants concede the third element, that they terminated Ms. Gunther's employment because of the need to accommodate her disability. DSJ MOL at 9 n.4; *see* Ex. 18.

Accordingly, Defendants' motion for summary judgment on this claim turns on whether there is a dispute of fact that Ms. Gunther was qualified for the EAA position. Viewing the evidence in the light most favorable to the EEOC and drawing all inferences in favor of the EEOC, there is ample evidence for a reasonable jury to find that Ms. Gunther was qualified. Defendants themselves found her to be qualified until they learned she had cancer, and Defendants' argument that her need for a modest amount of time off for medical appointments would impose an undue hardship on the company is one a jury could reasonably reject.

Therefore, summary judgment on this claim is not warranted.

### 4. There Is An Issue of Material Fact Of Whether Defendants Retaliated Against Ms. Gunther

As an alternative to its claim that Defendants discharged Ms. Gunther because of her

disability, the EEOC claims that her termination was retaliation for requesting an accommodation. Summary judgment is also not warranted on this claim.

A burden shifting analysis applies to the retaliation claim because the EEOC relies on circumstantial evidence. *Collazo-Rosado v. Univ. of Puerto Rico*, 765 F.3d 86, 92 (1st Cir. 2014). To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity (2) suffer a materially adverse action and (3) the protected activity caused the materially adverse action. *Rios v. Centerra Grp. LLC*, 106 F.4th 101, 118 (1st Cir. 2024). A prima facie case burden "is not an onerous one." *Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 26 (1st Cir. 2004).

The first two elements are not seriously in dispute.  Requesting an accommodation is protected conduct under the ADA. *Kelley v. Corr. Med. Servs., Inc.*, 707 F.3d 108 (1st Cir. 2013). When Ms. Gunther she advised Defendants of her disability and need for accommodation, she engaged in protected activity. Defendants' termination of Ms. Gunther's employment plainly fulfills the second element of a materially adverse action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also Rios*, 106 F.4th at 120.

Regarding the third element, there is evidence that would permit a reasonable jury to find Ms. Gunther's protected activity caused her termination. "Very close" temporal proximity between an employer's knowledge of protected activity and a materially adverse employment action may establish causality. *Cherkaoui*, 877 F.3d at 28-29 (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Adverse action that follows protected activity by "roughly a month" is sufficient evidence of causation for a prime facie case. *See Calero-Cerezo*, 355 F.3d at 26. Here, Defendants fired Ms. Gunther's two days after receiving her second medical note, protected activity. The EEOC has met the burden to present evidence of a prima facie case of retaliation.

Once a plaintiff makes this prima facie showing, the burden shifts to the employer to offer

28

evidence of a legitimate, nonretaliatory reason for its actions and then back to employee to show that the employer's reason was pretext. *Collazo-Rosado*, 765 F.3d at 92; *Kelley*, 707 F.3d at 115. Defendants' motion fails to address this point—or analyze the elements of a retaliation claim at all, for that matter—and merely reiterates their contention that they could not provide an accommodation. The adverse action at issue in this claim is Defendants' decision to *terminate* Ms. Gunther, however. Defendants' request for summary judgment on this claim may be denied based on Defendants' failure to carry its burden at this step of the analysis.

Even if Defendants are credited as having met their burden and that their reason for discharging Ms. Gunther was due to an inability to accommodate her, summary judgment would still be unwarranted. There is evidence Defendants' proffered reason was pretext. *See Ponte v. Steelcase Inc.*, 741 F.3d 310, 323 (1st Cir. 2014). Pretext may be shown through "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." *Moore v. NSTAR Elec. & Gas Co.*, 320 F. Supp. 3d 261, 269 (D. Mass. 2018) (quoting *Straughn v. Delta Airlines, Inc.*, 250 F.3d 23, 42 (1st Cir. 2001)).

A jury could find that Defendants decided to discharge Ms. Gunther immediately after she requested an accommodation *because* she requested it and before they even had the information that they claimed to need to evaluate the request. On October 6, Defendants received Ms. Gunther's first medical note, which indicated that she needed a scheduling accommodation. PSOF ¶ 173. The very next day, Defendants communicated with other applicants for the EAA position. PSOF ¶ 174. Defendants did not ask for additional information about Ms. Gunther's needed accommodation until October 13, 2021, and state that they did not receive the additional information until October 26, 2021. DSOF ¶¶ 44, 45. Yet during this period, Defendants actively searched for Ms. Gunther's replacement: Between October 8 and October 28, Defendants were in touch with *seven* other

29

candidates for Ms. Gunther's position. PSOF ¶¶ 174-178. From this timeline, a reasonable factfinder could infer that Defendants decided to replace Ms. Gunther before they even knew what her accommodation needs were, and that they fired her because of her request for an accommodation and not their inability to accommodate her.

Defendants' argument that the EEOC impermissibly "repackages" its failure-to-accommodate claim is incorrect. *See* DSJ MOL at 19. Preliminarily, "it is well settled that [a]n ADA plaintiff may assert a claim for retaliation even if she fails to succeed on a disability [discrimination] claim." *See Echevarria v.*, 856 F.3d at 133 (alterations in original). Of course, a plaintiff cannot repackage a failure to accommodate claim. *See Hines v. Ellis Nursing Home, Inc.,* No. 23-CV-10874-DJC, 2023 WL 7619035, at *5 (D. Mass. Nov. 14, 2023). However, the EEOC's retaliation claim is not that Defendants failed to *accommodate* Ms. Gunther in retaliation for requesting an accommodation, but rather that they *fired* her for requesting an accommodation.

Defendants point to no grounds for resolving this claim on summary judgment.

## V.    CONCLUSION

For the reasons stated above, the EEOC respectfully requests that the Court grant its partial motion for summary judgment and deny Defendants motion for summary judgment in its entirety.

Dated:  December 23, 2025                        Respectfully submitted,

                                                          /s/ *Gena Miller*
                                                        Gena Miller
                                                        Counsel for Plaintiff
                                                        U.S. EQUAL EMPLOYMENT
                                                        OPPORTUNITY COMMISSION
                                                        33 Whitehall Street, 5th Floor
                                                        New York, NY 10004
                                                        (929) 506-5342
                                                        gena.miller@eeoc.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2025, a copy of the foregoing was filed electronically using the CM/ECF system. Transmission of the Notice of Electronic Filing through the court's transmission facilities will constitute service of the filed document upon registered ECF users.

/s/ *Gena Miller*
Gena Miller

31